UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| MHC 37TH AVE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Case No. 2:25-cv-516 |
| v. | ) | |
| | ) | |
| CITY OF HOBART, INDIANA, | ) | |
| KAREN HANSEN, BUILDING | ) | |
| COMMISSIONER; | ) | |
| CONNOR MILLER, ZONING | ) | |
| ADMINISTRATOR | ) | |
| TIM KINGSLAND, HSD | ) | |
| COORDINATOR | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, ACTION FOR MANDATE, AND DAMAGES

MHC 37th Ave LLC ("MHC"), by counsel, for its Complaint against City of Hobart, Indiana ("Hobart"); Karen Hansen, the City of Hobart Building Commissioner (the "Building Commissioner"); Connor Miller, the City of Hobart Zoning Administrator (the "Zoning Administrator"); and Tim Kingsland, the City of Hobart Sanitary/Stormwater District Coordinator (the "Sewer Coordinator") (together, Hobart, the Building Commissioner, the Zoning Administrator, and the Sewer Coordinator are the "City Parties"), alleges and states as follows:

## THE PARTIES

1. MHC is a limited liability company registered to do business in Indiana.

2. Hobart is a city in Lake County, Indiana.

1

3.    Karen Hansen, the City of Hobart Building Commissioner is a citizen of Indiana.

4.    Connor Miller, the City of Hobart Zoning Administrator is a citizen of Indiana.

5.    Tim Kingsland, the City of Hobart Sanitary /Stormwater District Coordinator is a citizen of Indiana.

6.    The City Parties' address is 414 W. Main Street, Hobart, Indiana 46342.

JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this civil action arises under the Constitution, laws or treaties of the United States. This Court also has supplemental jurisdiction over the claims in this Complaint that arise out of Indiana law, pursuant to 28 U.S.C. § 1367(a)

8.    Venue is proper in this Court pursuant to 28 U.S.C § 1391(b).

**BACKGROUND**

*The Mobile Home Park*

9.    In 2021, MHC purchased Riverwood Estates f/k/a Cressmoor – the mobile home community at 615 West 37th Avenue, Hobart IN 46342 (the "Park")

10.    Prior to such purchase, MHC checked with Hobart to determine if there were any building violations associated with the Park.  In response, Marisa Turner, counsel for Hobart, reported that there were no violations:

From: **Marisa Turner** <mturner@cityofhobart.org>
Date: Thu, Sep 16, 2021 at 12:57 PM
Subject: Re: Zoning Determination Letter 615 West 37th Avenue
To: Daniel Hodges <daniel@lifestylemsvs.com>


Good afternoon Daniel,

I have received this information from the Building Department.

*"As far as I can tell, I do not see any open violations for 615 w 37th ave from the Building Department's side. I looked through all the file folders under this address, which dated back many years.  Hope this helps."*

To that end, there are no further documents responsive to your request and is now considered fulfilled.  It has been a pleasure working with you!

Stay well,
~ Marisa ~

11. MHC also requested a zoning determination letter from Hobart.  In response, Ross Pietrzak, the City Planner, reported that the Park was zoned B-3, that it was operating and could continue operating as a legal non-conforming use, and "the property can have a total of 80 mobile homes."  An image is below:

3



September 30, 2021

Cohen & Sawochka
C/O Daniel Sawochka
417 W 81st Ave, 605
Merrillville, IN 46410

RE: Zoning Verification Letter – Parcel # 45-09-30-201-001.000-018 – 615 W 37th Avenue

To Whom it May Concern,

The subject parcel is zoned B-3 / R-2. A copy of the official Zoning Map for this area is attached to this letter. In 1969, the property was rezoned from C-2 to C-3 (Ord #942) and approved for a Mobile Home Park as a Conditional Use (Ord #943). In 1971, the property was rezoned from C-3 to B-3 (Ord #1031), making the Mobile Home Park use a legal non-conforming use. The property would be subject to the requirements of 154.465, Non-Conforming Uses of Land, which permits the continuation of the use as approved by Ord #943. The legal description for the conditional use, as identified in Ord #943 and excluding a 2004 conveyance, totals 8.01 acres. Per Ord #943 Section 2.(b), the property can have a total of 80 mobile homes. Any expansion of the use beyond the legal description identified in the ordinance or beyond the conditions of the approval would not be permitted without first bringing the property into compliance with current zoning standards.

Respectfully,

Ross Pietrzak
City Planner

MHC relied upon these representations from Hobart in purchasing the Park.

*The Meeting with Hobart's Mayor*

12.    On April 9, 2024, MHC met with Mayor Huddleston and Steve McDermott.  At that meeting, MHC conveyed its plan to revitalize the Park by removing older homes and bringing in newer homes.

13.    In response, the Mayor and McDermott purported to support MHC.  The Mayor stated that he "looked forward to lots of positive progress in the coming weeks"

and he was "looking forward to this being a project that [Hobart could] be proud of." (Email dated 04/10/24).

14. Likewise, McDermott later acknowledged the same saying that when he and the Mayor met with MHC, they made it clear that "the city would fully support efforts to improve the site." (Email dated 05/02/25).[1]

15. In response to Hobart's promises and commitment to support the Park, MHC expressed that it was "looking forward to turning the community around and appreciate[d] having [the Mayor and McDermott] as partners toward [their common goal." (Email dated 04/10/24). MHC further notified Hobart that it planned to begin the improvement project. (Email dated 04/10/24).

16. Almost instantly and in contravention of its explicit representations to MHC, Hobart began frustrating MHC's efforts to improve the Park through a series of roadblocks.

*The Roadblocks.*

17. In mid-April 2024, when MHC began working with NIPSCO to replace propane tanks with permanent gas service for the Park, McDermott began asking for "a site plan to get an idea of your plans." (Email dated 04/12/24).

18. At that time, MHC notified McDermott that they did not have a site plan and, although they requested one from both the prior owners and Hobart, neither the prior owners nor Hobart could provide a site plan. (Email dated 04/15/24).

---

[1] During that discussion, the Mayor and McDermott raised the issue of the DR Horton community behind the Park and asked MHC if it was open to exploring other uses for the Park. MHC answered in the negative. In light of the events that have transpired, MHC now reflects heavily on that ask.

19.    Thereafter, relying on the representations of Hobart, MHC hired a contractor licensed by the U.S. Department of Housing and Urban Development ("HUD")[2] to place its first new mobile home in the Park.

20.    Hobart immediately issued a stop work order indicating that: (1) the contractor could not proceed because he was not licensed with Hobart; (2) the home could not be placed on the lot without a new location permit from Hobart; and (3) he required a site plan "for the placement of trailers and such" (together, "Unlawful Mandates"). (Email dated 07/25/24).

21.    MHC was taken aback by these new demands made by Hobart but took comfort as McDermott promised to "work with [MHC's] contractor to get the proper permits to keep this project moving." (Email dated 07/25/24).

22.    In late August 2024, MHC had a Zoom call with the Mayor and McDermott to try to get the project back on track.

23.    During that call, to address Hobart's demand for a site plan, MHC stated that their plan was to "rent the existing lots that are already approved and grandfathered by the City of Hobart" – not create new lots in the Park. (Email dated 09/03/24).

24.    Although McDermott admitted he was not familiar with mobile home park laws, McDermott insisted that MHC provide a site plan and mandated that all new installs had to conform to the current Indiana Administrative Code (more "Unlawful Mandates").  (Email dated 09/03/24).

---

[2] MHC learned that their contractor did not have his Indiana license, but he later obtained it.

25.  McDermott made it clear that, unless MHC met these amorphous conditions, no new homes would be permitted at the Park.

26.  On September 3, 2024, MHC alerted McDermott that it did not understand his demands and needed clarification on what Hobart was asking of MHC. (Email dated 09/03/24).

27.  MHC further pled with Hobart stating: "I do not believe you have a right to effectively halt our ability to bring mobile homes into Riverwood Estates." (Email dated 09/03/24).

28.  Finally, MHC put Hobart on notice that it was treating MHC differently than all prior owners of the Park and its unlawful restrictions on the Park were costing MHC $25,000 per month, in addition to hundreds of thousands of dollars in immobilized homes. (Email dated 09/03/24).

29.  On November 14, 2024, MHC was forced to involve its counsel, Carl Becker.

30.  On November 14, 2024, Becker attended a phone call with counsel for Hobart, Heather McCarthy, to try to resolve the issues with the Park.

31.  Suddenly, Hobart changed course indicating that its refusal to allow MHC to bring new homes into the Park was due to a failure to follow the mobile home park licensure requirements of the Indiana State Department of Health (the "IDOH"). Specifically, Hobart alleged a lapse in the Park's licensure from December 31, 2023, through November 21, 2024.

32.  In response, Becker explained to McCarthy that the Park had fully complied with the licensure process of the IDOH.

33.    The Park timely applied and paid all required fees by statute for its license renewal before its license expired on December 31, 2023. Thereafter, in accordance with the IDOH renewal process, the IDOH sent its personnel out to perform an inspection of the Park and cited certain issues with the Park. In the months that followed, MHC worked with the IDOH to resolve the cited issues and, at that time, the Park was simply waiting for its license renewal from the IDOH.

34.    On November 26, 2024, Becker further explained to McCarthy that the IDOH allows parks in these situations to continue operating while working on citations (Email dated 11/26/24). In response, McCarthy asked Becker to provide her with "documentation regarding compliance with IDOH licensing requirements." (Email dated 11/26/24).

35.    McCarthy represented that, once Becker provided her with those documents, they could "schedule a call with [Hobart] staff regarding next steps." (Email dated 11/26/24).

36.    On December 1, 2024, Becker did just that by providing McCarthy with a copy of the IDOH license for the Park. (Email dated 12/01/24). Becker further asked McCarthy why MHC was "not currently being allowed to bring homes in and what the ordinances might be of which [MHC was] running afoul." (Email dated 12/01/24).

37.    Becker indicated that MHC needed "a legal basis for the community being essentially shut down from business as usual and being unable to operate it as regularly done." (Email dated 12/01/24).

38.    McCarthy responded generally referencing Hobart Municipal Code (the "Hobart Code") Chapter 145: Zoning, Section 154.320-154.323 – which notably do not apply to existing mobile home parks and, instead, apply to the "development of a mobile home park" and to requests for a "planned unit development district mobile home park" (more "Unlawful Mandates"). (Email dated 12/4/24).

39.    McCarthy further attached Ordinance 943 – the Conditional Use Permit for the Park and cited Section 2(q) which provides:

```
        (q)   A Mobile Home Park License must be finally se-
cured from the Indiana State Board of Health within three (3)
years from the date of this ordinance and thereafter maintained
otherwise this Conditional Use Permit shall be null and void.
```

(more "Unlawful Mandates"). (Email dated 12/4/24).

40.    McCarthy falsely claimed that the Conditional Use Permit was null and void because MHC failed to maintain its license with IDOH. (Email dated 01/07/25).

41.    Becker asked for clarification as to which ordinance Hobart was alleging MHC violated and how Hobart was alleging MHC violated said ordinance. (Email dated 12/20/24).

42.    McCarthy cited the 2020 Indiana Residential Code which does not apply to the Park and, instead, only applies to mobile homes on non-rental lots (more "Unlawful Mandates"). (Email dated 01/07/25).

43. McCarthy also cited Hobart Code Chapter 150.061, which does not apply to the placement of an already erect mobile home and instead only applies to the _erection_ of buildings and structures:

> **§ 150.061  PERMIT REQUIRED; PAYMENT OF FEES.**
>
> A permit shall be obtained before beginning construction, alteration or repair of any building or structure, garage, driveway, or off street parking location including on site construction, or erection of any preassembled building or structure, of which the value exceeds $250, using forms furnished by the Building Department and all fees required by this code shall be paid to the City, payable at the Clerk-Treasurer's office.  The City Building Official shall take into consideration drainage and runoff when approving such a permit request and may consult with the City Engineer and MS4 Coordinator to determine if any questionable drainage and runoff considerations require a topographic survey or professionally prepared drainage plan.
> (Prior Code, § 4-17.6)  (Ord. 89-13, § 7; Ord. 97-09, § 1; Ord. 2014-42, § 6; Ord. 2016-37, § 1)

(more "Unlawful Mandates"). (Email dated 01/07/25).

44. Finally, McCarthy generically cited Hobart Code Chapter 150 and 154, without any specification as to the provisions she was claiming were at issue (more "Unlawful Mandates").  (Email dated 01/07/25).

45. In or around February 2025, MHC hired a licensed state contractor to move a brand-new mobile home onto a pre-existing lot #64 within the Park.



46. The contractor reached out to Hobart on the matter to no avail.

47. On March 2, 2025, Becker contacted McDermott about the situation and McDermott denied knowledge. (Email dated 05/02/25). Then, McDermott began complaining that the roads and vacant trailers were in disrepair in the Park. (Email dated 05/02/25). MHC cannot help but note the hypocrisy of Hobart complaining about the old trailers in the Park while refusing to allow MHC to bring new trailers into the Park.

48. On April 16, 2025, McDermott issued an illegible citation to MHC for:

(the "First Citation").

49. After receiving a legible copy of the First Citation on July 30, 2025, MHC now understands it to read "Blighted Surfaces, Unfit Driving Surface, and Abandoned Home in Drive."

50. Other than these vague terms and despite request for clarification by MHC, Hobart has failed to provide MHC with any detail on the alleged violation –

i.e., what does "blight" and "unfit" mean and which structures and surfaces are at issue? Hobart just expects MHC to magically understand and fix whatever it is at issue (more "Unlawful Mandates").

51. On May 14, 2025, Hobart responded to an Access to Public Records Act Request from MHC seeking "all permits issued within any manufactured housing communities located in the City of Hobart from March 2000 to Present."

52. Confirming MHC's suspicions, Hobart was unable to produce record of a single, solitary permit for the movement of a mobile home onto a pre-existing lot in any of the mobile home parks located in Hobart.

53. That is surely because there neither is nor has ever been a permit requirement to move a mobile home onto a pre-existing lot in a mobile home park in Hobart. This permit requirement appears to have arbitrarily and capriciously been created by Hobart and solely applied to MHC (more "Unlawful Mandates").

54. MHC was notified by the Health Department of an issue with its sewer. MHC immediately hired a contractor referred by the Hobart Sanitary/Storm Water Department to remedy the issue.

55. That contractor then immediately pumped out the lift station and identified the issue – a faulty pump. As the permanent replacement pump was on back-order, that contractor got the lift station back up and running.[3]

---

[3] Shockingly, Hobart then notified MHC that the contractor that it recommended to MHC was not licensed and could not be used by MHC. Upon checking with the contractor, MHC learned that said contractor was fully licensed with Hobart.

56.    On May 20, 2025, after the sewer system had already been repaired, Hobart

cited MHC for "sanitary illicit discharge:"

## Hobart Sanitary and Storm Water
## NOTICE OF VIOLATION

THIS SITE HAS FAILED TO MEET SANITARY and STORM WATER COMPLIANCE STANDARDS FOR ONE OR ALL OF THE FOLLOWING:

- City of Hobart Construction Storm Water Ordinance, Chapter 152
- City of Hobart Sanitary Sewer Ordinance, Chapter 53
- Indiana Department of Environmental Management (IDEM) CSGP

Business: Cressmoor Trailer Park
Address/Location: 615 W 37TH AVE, Hobart, IN. 46342

Date:  5/20/2025

**Level of Violation:**    1. Major/Direct (0-2 days) - 2. Moderate/Indirect (1-5 days) - 3. Minimal (1-10 days)

**The following violation(s) was (were) noted by City of Hobart staff:**

**1. Level (1): Discharge of sanitary effluent from entity sanitary manholes**
Chapter 53: § 53.307 SYSTEM DEFECTS; DUTY TO CORRECT
Should any defect exist or occur in any private or business sewage collection and disposal system which would cause the sewage disposal system to fail to meet the requirements of this Chapter and cause an unsanitary condition, the defect shall be corrected immediately by the owner or their agent or the occupant. (Prior Code, § 17-39) (Ord. 614, § 2) (Prior Code, §53.054)
**2. Level (1): Discharge of sanitary effluent from entity Sanitary Manholes**
Chapter 152: § 152.020.02 ILLICIT DISCHARGES
(5) In addition to illicit discharges, the discharge of spills and the dumping and/or disposal of materials other than stormwater, including, but not limited to, industrial and commercial wastes, commercial car wash wastes, sewage, garbage, yard waste, trash, petroleum products, including used motor vehicle fluids, as well as leaf litter, grass clippings, and animal wastes into the storm water drainage system, whether directly or indirectly, are prohibited, unless authorized under an NPDES permit or a permit issued by the Utility.
**3. Level (1): Lift Station not working, no flow and/or pump operation was observed**
Chapter 53: § 53.307 SYSTEM DEFECTS; DUTY TO CORRECT
Should any defect exist or occur in any private or business sewage collection and disposal system which would cause the sewage disposal system to fail to meet the requirements of this Chapter and cause an unsanitary condition, the defect shall be corrected immediately by the owner or their agent or the occupant. (Prior Code, § 17-39) (Ord. 614, § 2) (Prior Code, §53.054)
**4. See attached pictures for further detail of the noted City of Hobart ordinance infractions**

**VIOLATION(S) MUST BE CORRECTED BY THE DATE PROVIDED TO AVOID ENFORCEMENT ACTIONS**

City of Hobart Ordinance Corrective Actions required to be completed by: May 23, 2025
Previous NOV Warning(s): 2016
Note: Inspection by City Designated Representatives, Owner Designated Represenative and by City MS4 Coordinator at date and time agreed upon by all parties.

Copy provided to:  Owner: MHC 37th Ave LLC, PO Box 5521, Scottsdale, AZ 85259
Issued by: Tim Kingsland, Hobart Sanitary/Storm Water Coordinator

13

57.    On May 23, 2025, MHC, by and through Becker, notified Hobart that it had corrected the violations. Notably, any discharge of sanitary effluent had been stopped and the lift station was and remains working correctly.

58.    On May 27, 2025, Kingsland emailed Becker indicating the temporary pump did not correct the violation and demanding:

> 1. 3-year Maintenace plan detailing maintenance of the site sanitary distribution infrastructure by the Owner to prevent a failure of the system sanitary pump distribution system (whereas public health and/or safety is not compromised) for submission to city staff for their review and approval.
> 2. Installation of a new lift station pump and piping, electrical system to comply with COH electrical code and submit proposed documentation to city staff for review and approval.
> 3. Securing of applicable city permits for all work associated with the lift station repair.

59.    Kingsland warned MHC that he would not clear the violation until MHC complied with his demands.  Notably, Kingsland did not identify any relevant Hobart Code citations for his demands (which are "Unlawful Mandates").

60.    Then, on July 30, 2025, Kingsland issued another email complaining that:

14

- The lift station pump and related components installed as is, is only a temporary fix (120v residential pump) therefore the existing lift station does not comply with the project initial lift station design as inspected and noted in the field among IDEM, Indiana State Board of Health representatives, City Staff and the Owner designated representatives. Due to the current lift station condition and operational status, a complete rehab of the existing lift station will be required to ensure that the system reliability for current and future use does not become a public health issue as documented previously through inspections by IDEM and the City
- The electrical/control components of the existing lift station do not comply with the National Electrical Code and city code requirements
- The city cannot verify from any existing documentation (ex: as-builts) if the current sanitary infrastructure system is adequate per existing engineering design/calculations for current use and any potential expansion
- Maintenance records of the site sanitary system cannot be found to verify if the current maintenance of the sanitary infrastructure complies with the Hobart Sanitary District requirements as noted per Chapter 53
- The development may require a separate agreement with the Hobart Sanitary District for Mult-Unit Property as noted per Chapter 53

61. Notably, Kingsland has not cited a single provision within the Hobart Code allowing Hobart to mandate a complete rehab of the existing lift station, as-builts of the existing sewer system, maintenance records for the existing sewer system, or agreement with Hobart for a "Multi-Unit Property" (more "Unlawful Demands"). And, MHC cannot find a single provision within the MHC allowing Hobart to make these demands on MHC.

62. On August 1, 2025, Kingsland sent another email regarding the sewer stating:

> As noted in the email of 7/30/2025 to Ms. Gibson, there are several items identified which city staff will need have in order to complete a staff engineering assessment/review prior to staff approval of the installation regarding:
> - verification of the development lift station pump capacity-replacement of temporary repair pump with new system
> - sizing of the discharge piping from the site to the City of Hobart manhole-capacity and flow rate
> - if the site existing sanitary sewer capacity is designed for additional/new homes
>
> City staff has no documentation of the site's existing sanitary system; therefore, an engineering assessment/review/approval cannot be completed by City Staff regarding the sizing of pump and piping for the lift station upgrade to current city standards.

63. That very same day, MHC, by and through its agent Matt DeFreece, reached out by phone to Kingsland. DeFreece endeavored to determine exactly what MHC needed to do to satisfy Hobart. The conversation went as follows:

- Existing Pump & Voltage: Kingsland stated that the existing pump was inadequate. Kingsland stated that the previous pump was a 240V. DeFreece asked for the pump specifications needed for a replacement. Kingsland said he did not know without reviewing as-built drawings.

- As-Built Drawings: MHC does not have as-built drawings. DeFreece asked Kingsland if Hobart had such drawings from when the Park was originally approved and the sewer system was installed. Kingsland responded in the negative. Despite both parties' lack of as-built drawings, Kingsland indicated MHC needed as-built drawings to bring the sewer system into compliance.

- City Codes and Next Steps: DeFreece asked Kingsland to send the Hobart Code codes/statutes containing the requirement for as-built drawings. Kingsland agreed (but never did so). DeFreece emphasized

MHC's commitment to resolving this issue quickly – even though the resolution remained unclear even to Kingsland.

DeFreece alerted Kingsland that MHC was still waiting on its contractor to obtain the permanent pump and necessary permits for installation. Kingsland did not provide any other dates or deadlines or mandate anything further.

64. On August 6, 2025, Kingsland sent a letter to MHC citing "a lack of updates" on the sewer issues by MHC. This despite the call DeFreece had with Kingsland a mere five days earlier and despite Kingsland's failed promise to provide DeFreece with additional information on the as-builts.

65. Then, Kingsland issued virtually blank citation to MHC citing only "Sanitary Sewer System Defects" and fining MHC $2,500:

CITATION NO.    **2025-01**

## HOBART SANITARY DISTRICT

### CITATION FOR LOCAL ORDINANCE VIOLATION

| DATE: 8/6/2025 | | TIME: | |
|---|---|---|---|
| LAST NAME: | | FIRST: | MI: |

COMPANY/ENTITY:    **MHC 37th Ave, LLC**

STREET ADDRESS:

| CITY: Hobart | STATE: IN | ZIP: 46342 |
|---|---|---|

VEHICLE ID:                         OPERATOR LICENSE NO.:

LOCATION OF VIOLATION    **615 W 37th Avenue**

VIOLATION EXPLANATION    **Sanitary Sewer System Defects**

| ORDINANCE NO./SECTION: 53.307 | FINE $2,500.00 |
|---|---|

☐ You are hereby cited for committing a violation as herein described which is contrary to the form of the Hobart Municipal Code. You may pay this fine at the HOBART CLERK-TREASURER'S OFFICE located at Hobart City Hall; 414 Main Street; Hobart, Indiana. (Payable to: City of Hobart) at which time you may waive the right to trial, admit the violation and pay the fine as indicated. I WAIVE MY RIGHT TO TRIAL AND ADMIT THIS VIOLATION.

**Fine due on or before    9/3/2025**

SIGNATURE

☐ If you deny the violation, fail to pay the fine assessed after an admission of the violation, or fail to admit or deny the violation, the City Court attorney will be advised, and proceedings will be initiated in court for the alleged violation, at which time the fine may be higher. You shall appear at the HOBART CITY COURT located at Hobart City Court; 705 E 4th Street; Hobart, Indiana on:

**9/10/2025  9:00 AM**

☐ This alleged violation involves a civil penalty amount in excess of the statutory limit for receipt by the ordinance violation bureau. The City Attorney will be advised regarding this citation and proceedings will be initiated in court for the alleged violation.

| AGENCY: | **HOBART SANITARY DISTRICT** |
|---|---|
| BY COMPLIANCE OFFICER: | *Tim Kingsland* |
| Date: | 8/6/2025 |

(the "Second Citation").

66.    Per the citation, MHC had until September 3, 2025, to correct the "Sanitary Sewer System Defects" (with repairs that Hobart itself cannot identify with any specificity) or else MHC has to pay a fine of $2,500 or appear in Court.

67.    MHC has repeatedly requested that Hobart provide more detail on the First Citation and Second Citation (the "Citations") as it doesn't even understand

18

what Hobart is complaining about and/or what Hobart expects it to do. Hobart has failed and refused to provide any more detail or any guidance. MHC remains committed to keeping the lift station in operating order.

68. On November 12, 2025, Hobart and MHC are scheduled to have a hearing on the First Citation and Second Citation in Lake County, Hobart City Court, Cause No. 45H05-2505-OV-000069 and 45H05-2509-OV-164.

69. By and through their false assertion that the Park lost its legal "Non-Conforming Use" status under the Ordinance; their Unlawful Mandates; and their unconstitutional Citations, the City Parties have violated the U.S. Constitution, the Indiana Constitution, Indiana law (e.g. Indiana Code § 25-23.78-8-5 and Indiana Code § 36-7-4-1019), and the Hobart Municipal Code.

70. Even more, the City Parties have caused and continue to cause MHC tremendous harm.  At present, MHC estimates its damages to exceed $300,000.00 exclusive of its attorneys' fees and costs.

## COUNT I: DECLARATORY JUDGMENT

71. MHC incorporates the allegations above as if restated herein.

72. The Federal Declaratory Judgement Act, U.S.C.S. § 2201, provides those with cases of actual controversy within the federal jurisdiction the opportunity to request that the Court "declare rights and other legal relations of any party seeking such declaration." 28 U.S.C.S. § 2201

73. MHC is a person interested under the Ordinance and who has and seeks to have its rights, status, and legal relations determined under the Ordinance.

74. MHC invokes the Federal Declaratory Judgment Act and seeks a declaration that the Park never lost its legal "Non-Conforming Use" status under the Ordinance; the Park may continue to operate as a legal Non-Conforming Use under the and bring new homes onto existing lots in the Park without complying with the Unlawful Demands.

75. MHC further invokes the Federal Declaratory Judgment Act and seeks a declaration that the Citations are unconstitutionally vague, do not provide fair notice, and are therefore unlawful. As a result, they do not provide fair notice and are contrary to basic constitutional due process. *See Jones v. Flowers,* 547 U.S. 220, 126 S. Ct. 1708 (2006).; *Knutson v. Vill. of Lakemoor*, 932 F.3d 572 (7th Cir. 2019).; *City of New Haven v. Chemical Waste Mgmt. of Indiana, LLC*, 701 N.E.2d 912, 918-919 (Ind. Ct. App. 1998) (*citing Yater . Hancock County Planning Commission*, 614 N.E.2d 568 (Ind. Ct. App. 1993); *see also Ltd. Devs, LLC v. Town of New Palestine*, 2024 Ind. App. Unpub. LEXIS 1078, *19-22 (Ind. Ct. App. August 19, 2024).

## COUNT II: ACTION FOR MANDATE

76. MHC incorporates the allegations above as if restated herein.

77. The Action for Mandate Statute, IC § 34-27-3-1 et seq provides:

> Sec. 1. An action for mandate may be prosecuted against any inferior tribunal, corporation, public or corporate officer, or person to compel the performance of any:
>
> (1) act that the law specifically requires; or
>
> (2) duty resulting from any office, trust, or station.

78.  City Parties are legally required to act pursuant to the terms of the Ordinance and Indiana law and the duties that arise from their offices, trusts, or stations as set forth in the Ordinance and under Indiana law.

79.  MHC has a legal right to continue to operate as a legal Non-Conforming Use under the and bring new homes onto existing lots in the Park and City Parties are legally required to grant the necessary permits for MHC to bring new homes onto existing lots in the Park.

80.  MCH invokes the Action for Mandate Statute and seeks an order requiring City Parties to treat Riverwood as an ongoing, legal "Non-Conforming Use" under the Ordinance.

81.  MCH invokes the Action for Mandate Statute and seeks an order requiring City Parties to cease interfering with MHC's efforts to bring new or used homes onto existing lots in the Park and, upon application by MHC, grant any necessary permits for MHC to bring new homes onto existing lots in the Park.

## COUNT III: DISCRIMINATORY HOUSING PRACTICES

82.  MHC incorporates the allegations above as if restated herein.

83.  Upon information and belief, City Parties' false assertion that the Park lost its legal "Non-Conforming Use" status under the Ordinance; their Unlawful Mandates; and their unconstitutional Citations are nothing more than a pretext for discrimination against low income housing, which constitutes a disparate effect and/or has a disparate impact.

84.   City Parties' actions have caused a discriminatory effect, negatively impacting those who access low-income housing options provided by MHC, many of whom are members of a protected class based on their race, color, age, disability and/or national origin.

85.   This conduct constitutes discriminatory housing practices under the Fair Housing Act, 42 U.S.C. § 3601, et seq. and Indiana law.

## COUNT IV: INVERSE CONDEMNATION

86.   MHC incorporates the allegations above as if restated herein.

87.   By and through their false assertion that the Park lost its legal "Non-Conforming Use" status under the Ordinance; their Unlawful Mandates; and their unconstitutional Citations, the City Parties have taken or substantially interfered with MHC's free use, enjoyment, and interest in the Park.

88.   City Parties have engaged in these activities under the auspices of the public use of protecting the public, but MHC believes they are designed to allow the real estate comprising the Park to serve the goals of one or more of City Parties.

89.   The Fifth Amendment of the U.S. Constitution and Indiana Constitutions require just compensation when a governmental entity takes private property for public use. MHC invokes those provisions and asks this Court to award it all losses it has sustained due to the wrongful conduct of Hobart – presently estimated to be in excess of $300,000.00

## COUNT V: 42 U.S.C. CODE § 1983

90.   MHC incorporates the allegations above as if restated herein.

91.     42 U.S. Code § 1983 – Civil Action for Deprivation of Rights provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

92.     By and through their false assertion that the Park lost its legal "Non-Conforming Use" status under the Ordinance; their Unlawful Mandates; and their unconstitutional Citations, the City Parties have, under color of state law, deprived MHC of its constitutional rights and privileges in and to the Park as secured by the Fifth and Fourteenth Amendments to the U.S. Constitution.

93.     MHC invokes 42 U.S. Code § 1983 and asks this Cour to declare that the Park never lost its legal "Non-Conforming Use" status under the Ordinance; the Park may continue to operate as a legal Non-Conforming Use under the and bring new homes onto existing lots in the Park without complying with the Unlawful Demands; and the Citations are unconstitutionally vague, do not provide fair notice, and are therefore unlawful.

94.     MHC invokes 42 U.S. Code § 1983 and asks this Cour to enjoin City Parties from further interfering with MHC's efforts to bring new or used homes onto

existing lots in the Park and order that, upon application by MHC, grant any necessary permits for MHC to bring new homes onto existing lots in the Park.

95.    MHC invokes 42 U.S. Code § 1983 and asks this Cour to enter an award of damages against City Parties and in favor of MHC in the amount of the lost revenue they have sustained due to unlawful conduct of City Parties – presently estimated to be over $733,500.00, plus attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, MHC 37th Ave LLC, by counsel, respectfully requests that this Court enter judgment in its favor and against the City of Hobart, Indiana; Karen Hansen, the City of Hobart Building Commissioner; Connor Miller, the City of Hobart Zoning Administrator; and Tim Kingsland, the City of Hobart, Sanitary/Stormwater District Coordinator as requested herein, and for all other just and proper relief.

Respectfully Submitted,

*/s/ Raegan M. Gibson*
Raegan M. Gibson          (27114-49)
THE GIBSON LEGAL GROUP
8440 Woodfield Crossing Blvd, Ste 360
Indianapolis, IN 46240
Tel:    (317) 721-7978
E-mail: raegan@thegibsonlegalgroup.com